## Case No. 14,692f.

### UNITED STATES v. BURR.[1]

[Coombs' Trial of Aaron Burr, 72.]

Circuit Court, D. Virginia. June 27, 1807.

#### CONTEMPT—OBSTRUCTING JUSTICE.

[1. An offer of a sum of money to a witness to remove his objections to going without the jurisdiction of the court to testify, is not necessarily an attempt to contaminate the source of justice, and a contempt of the court in which it is administered.]

[2. *Held*, on the evidence, that no contempt was intended to the court by General Wilkinson in procuring witnesses to testify, and that he was not guilty of any intentional abuse of its process, or of any oppression in the manner of executing it.]

[At law. Motion for attachment against General Wilkinson "for a contempt in obstructing the administration of the justice of the court."]

Mr. Burr's counsel called James Knox and Chandler Lindsley, (two of the witnesses of the United States,) whose affidavits had been drawn and were intended as the ground of the motion for the attachment.

The CHIEF JUSTICE asked if the papers could not be put into his hands, and the argument take place to-morrow; he wished to consider the question before it was discussed. This led to a debate of considerable length, in which the counsel for the prosecution favored the course suggested by the CHIEF JUSTICE, and the counsel for Colonel Burr opposed all delay.

At the close of the discussion, some conversation ensued relative to the form of the motion for an attachment against General Wilkinson. The counsel for the United States insisted upon a specification of the conduct for which it was to issue; that if generally expressed as a "contempt of the court," nothing but the spirit of divination could enable him to discover the specific offence charged against him, nor to prepare for his defence; that the precise circumstances which constituted the offence ought to be particularized.

Mr. Burr and his counsel said that the specification was to be found in the two affidavits, and that it was from delicacy to gentlemen, he had not attempted to make these affidavits matter of record, by introducing them on the face of the motion. The motion reduced to writing, stated the offence to be "for a contempt in obstructing the administration of the justice of this court."

The court then adjourned.

¹ [For reference to the various cases in this series, which, together, embrace a full report of the entire proceedings against Aaron Burr, see footnote to Case No. 14,692a.]

Saturday, June 20, 1807.

The court met pursuant to adjournment. Present: MARSHALL, Chief Justice, and GRIFFIN, District Judge.

Mr. Randolph rose to proceed with the motion, when he was interrupted by Mr. Hay, who communicated returns to subpœnas duces tecum (reported in the main case, No. 14,693), after which Mr. Randolph brought forward the motion. He said: The ground on which we make the motion is this: that Gen. Wilkinson, who is now before the court, in a case depending between the United States and Mr. Burr, deliberately abused the process of the law relative to a witness who has been summoned in this case. He contrived, on his own affidavit, and by his own power, to obstruct the free course of legal testimony, and to intimidate and coercively bring to this court a witness by the abuse of military authority. For this illegal proceeding it is the duty of the court to take notice of Gen. Wilkinson. As the cases ought to be kept distinct, I speak of him only; but it may be necessary to carry the principle into immediate execution as to other persons. The grounds of this accusation are the depositions of James Knox and Chandler Lindsley, which will be read to the court.

Mr. Hay objected to the introduction of these affidavits, because he understood they had been written and dictated by the counsel of Colonel Burr. He did not pretend to say that they contained anything which they did not believe to be true, nor did he know their contents. He understood that those witnesses had voluntarily gone and given information to the counsel, upon which the counsel had written or dictated the terms of these affidavits. The legal authorities showed that a court would never issue an attachment founded on affidavits taken by the agent or attorney of the party applying for it. He cited the case of the King v. Wallace, 3 Term R. 403, where the court had set aside an affidavit because it was sworn to before the attorney for the prosecution, and refused to grant an attachment.

Mr. Baker said: As to the affidavit of Knox, I know nothing; but as to the affidavit of Lindsley, it was written by himself. The facts are simply these: He called upon me with his affidavit already written, (I had never seen him before,) to know whether it was correctly written or not. I read it, corrected some inaccuracies in style, and wrote it over again. It was not sworn to when he brought it to me. After I had corrected those grammatical errors, and submitted it to Mr. Lindsley's inspection, he said that the statement was perfectly correct.

Mr. MacRae said, as the witnesses are now before the court, and can be examined viva voce, there is no inconvenience in the objection.

Mr. Wickham insisted that the regular and

established practice is, that when in the course of a trial collateral points arise in which it is necessary that testimony should be heard, not to produce viva voce testimony, but affidavits in support of them.

Mr. Burr said that, if agreeable to the court, he would have no objection to the examination of the witnesses in court, although the practice is, on principles of convenience, otherwise. As to the origin of this business, it was not perfectly understood, and some unfounded insinuations had been made concerning it. James Knox had called on him, stated the usage which he had received, and asked whether any redress could be obtained. One of his counsel, who was present at the interview, had concurred with him in opinion that some notice should be taken of this proceeding. At first they thought of referring him to Mr. Hay, but on reconsideration they thought that perhaps Mr. Hay might think himself disqualified from acting. Mr. Knox's own idea was that he ought to come into court and complain himself of the treatment he had received.

Mr. Wirt spoke against receiving the affidavits, and urged that the witnesses ought to be examined before the court.

Mr. Botts observed that Mr. Burr had signified his acquiescence in that course.

James Knox was then called, when Mr. MacRae said, that as the business was of importance to General Wilkinson, it was very desirable that he should be present at the examination of this and the other witnesses who might be introduced; that he was now before the grand jury, and he had applied to the gentlemen on the other side to postpone the motion until he could be present, but they objected to any delay. He therefore found it necessary to apply to the court to suspend the examination for a short time, till the general could be present.

Mr. Martin said, the question was whether a rule should be granted to show cause, with which neither General Wilkinson nor his counsel had anything to do, and were not in fact, as much as supposed to be present. This led to some further discussion, in which Messrs. MacRae, Wirt, and Martin participated, when

The CHIEF JUSTICE observed, that if the motion were to be postponed until Monday, and the witnesses on both sides were then heard, it would answer every purpose; and it might be considered then as a motion for an attachment, not for a rule to show cause.

Mr. Randolph said, we shall move then immediately for an attachment.

The examination was then postponed till Monday, and the court adjourned to that day.

Monday, June 22, 1807.

The court met pursuant to adjournment.

Mr. Randolph directed that James Knox and Chandler Lindsley be called, and was proceeding to open the motion he had introduced on Saturday, when Mr. MacRae objected to proceeding until General Wilkinson could be present, who was still under examination before the grand jury. After some discussion as to the propriety of proceeding in the absence of General Wilkinson, the court adjourned.

Tuesday, June, 23, 1807.

The court met pursuant to adjournment.

General Wilkinson appeared in court, and took his seat among the counsel for the United States.

Mr. Burr observed to the court, that as General Wilkinson was then present, he would proceed with his inquiry. He would have it, however, distinctly understood, that if the charge could not be brought home to General Wilkinson himself, so as to support the motion against him, yet it must attach according to the testimony, to any of his subordinate officers, as Mr. Gaines, or any other.

Mr. Hay objected to this extension of the motion, which he had understood to be confined to General Wilkinson alone, particularly as they had not given any intimation of such an intention before, and as no other person had any notice.

Mr. Randolph insisted that the evidence to be introduced must attach to General Wilkinson or any of his subordinate officers, or other persons, according to what the witnesses should prove. He read the charge against General Wilkinson: that he, in conjunction with others, did wilfully and unlawfully cause compulsory process to be served on James Knox and Chandler Lindsley, whilst in the city of New Orleans, whence they were transported by water to the city of Richmond, to give testimony for the United States in the case of Aaron Burr; the effect of which unlawful measures was directly and essentially tending to obstruct the free course of testimony, and of the administration of justice in this court, and to invade the privileges of witnesses.

The witnesses were then introduced. James Knox was first sworn, and testified as follows:

He says that he went to New Orleans sometime in March. Soon after his arrival he received a note from General Wilkinson, making some inquiry concerning Sergeant Dunbaugh. He waited on the general, who received and treated him handsomely, took him by the hand, and asked him if he were not afraid, after what had happened, and what had been said about him? He told him that he was not afraid. He asked him whether he were at liberty to reveal what had occurred in coming down the river? The witness said he was at liberty to reveal what he knew, but did not wish to do so. He inquired whether the witness were a Freemason? He then began to take notes. The witness stopped him from taking down, and told him it was not his wish to have what he

said taken down. He complained of distress; expected to be ruined. Said that there was a great force coming down the river. He asked the witness his circumstances; what money was due to him for his services in coming down? He answered, one hundred and fifty dollars. Asked him if he were in want of money, and offered to supply him which the witness refused. He said he was very unhappy; had lost his wife; but all that was nothing to his trouble on account of the state of the country. The witness said that a subpœna had been served on him about the 12th of May, by Mr. Gaines, to attend this court; that he told him he was not prepared to come round then, but he expected to get money in ten or twelve days, and would then be ready. He went to Gaines's office about four days afterwards; was taken by a sheriff on Sunday evening, who took him to Judge Hall's. The judge was from home. He went again, and was told by the judge that he must give his deposition or go round to Richmond. He answered that he had no objection to going to Richmond, but, having no counsel, would not give his deposition, lest he should commit himself. No person but the sheriff was present. The governor desired the sheriff to take his word if the judge could not be found; saw the judge, and was bailed until eleven o'clock; gave two securities, bound in five hundred dollars each, to avoid being put in gaol. When he appeared, the judge had before him a number of printed interrogatories. The witness asked the liberty of reading them. · He permitted him to do so. The judge asked him if he would answer. The witness refused until he had counsel, but offered to be placed in confinement until he could procure counsel. He afterwards saw, as his counsel, Mr. Carr, who informed him that the judge had no right to demand such answers. The judge still persisted to interrogate him, to some of which interrogatories he answered in order to save trouble. The witness then related everything that passed from Meadville until his arrival in New Orleans. Mr. Fort was then sent for and interrogated. He made some observations, and refused to answer, (being, he said, about Tom, Dick, and Harry.) After which the judge gave the deputy marshal a note, who put Fort and the witness into gaol, among forty or fifty negroes and .criminals. Fort was bailed by his friends; but they required bail of the witness in five or six thousand dollars, and he remained in gaol until the vessel was ready in which he embarked. He requested leave to get his clothes. Dunbaugh then came with some men with belts and side arms. The witness asked if they were a guard? He was answered no, but that they were some acquaintances. That he has since been told by Dunbaugh they were a guard. They went with Dunbaugh and himself to th· water edge. The witness asked whether Lieutenant Gaines were on board? They said no, but soon would be. When Dunbaugh came to the gaol he had an order, which was handed to the gaoler. While in gaol the witness wrote to Lindsley and Doctor Mulhollon to come and see him, and told them if they came to New Orleans what they might expect. He was informed by the gaoler that they would be confined. He did not send the note. He did not see Gaines until the next day. When Lieutenant Gaines came on board the vessel, he said the witness was in a bad humor. The witness told him he was; and Gaines said that he had better be satisfied, and bear his situation with patience. He asked Gaines for leave to go on shore for his clothes; he did not care what guard was sent with him. Gaines said that it was not in his power to grant it, but the power was in General Wilkinson. The witness was not permitted to get his clothes, and came without any except what he had on at the time, and except that Lindsley brought him one of his shirts, which he had lent him. Gaines, after having told him that he might put him in irons, and bring him round in that manner, offered him forty dollars. The witness said that if he would let him go on shore he did not want it; otherwise must take it. It was paid and sent on shore; twenty dollars were paid to his landlord, and the other twenty dollars returned to him by Governor Claiborne, who came on board and went with them six or eight miles on the passage. And also, when they came to anchor in Hampton Roads, Gaines asked him if he had any objection to coming to Richmond? He answered that he never had any objection. Gaines said that he was sent by the authority of Judge Hall. General Wilkinson spoke to him next day, and asked him if he had any objection to come to Richmond. He answered he had not, if properly treated; but he had been brought off without clothes or money. General Wilkinson had not heard of his not being permitted to bring his clothes until that morning. General Wilkinson agreed he was ill treated. Told him that he (witness) must understand that he was brought round by the direction of Judge Hall. General Wilkinson proposed to let the witness go to Richmond upon his parole of honor, which was refused. Wilkinson said, if the witness wanted twenty dollars he should have it. Afterwards he talked to Mr. Lindsley, and returned to the witness, and said if he wanted fifty dollars he might have it. Witness wanting money to purchase clothes, took it. He observed, in the first conversation, that he had twice asked favors of him and Gaines, and would never ask a third favor of any person. He came to Richmond with Moxley in a pilot boat. Moxley told him that he· had orders from General Wilkinson to take charge of the passengers on board the Revenge, and bring them to Richmond, and there wait his (Wilkinson's) orders.

Cross-examination by the counsel for the

United States: Have you any military commission? Answer. None. Where were you born? Answer. In Maryland; left it very young; resided in Pennsylvania, and left it some time in November last. Left Pennsylvania (Meadville) for New Orleans on the 24th or 25th of November; went down the Alleghany and Ohio to Beaver; went from thence, with about twenty or thirty, to Blennerhassett's Island, where he did not recollect to have staid but two days, or a day and a half; left that place some time in December, Blennerhassett and another with them, who were the only persons who joined them there. Stopped at Shawnee Town; went with about double the number to Cumberland Island, just opposite to the mouth of Cumberland river; staid a day and a half; met with Colonel Burr and a few others; the whole number about fifty or sixty, about seven or eight boats, five fire-arms; went thence to Fort Massac; Sergeant Dunbaugh met them there with a musket, and after meeting with Colonel Burr, he considered himself under his direction; went to Natchez; Colonel Burr did not accompany them; went from Natchez to New Orleans. Some of the boats were chartered and others sold. They arrived at New Orleans on the 13th or 16th of March. The first notice he had, after seeing General Wilkinson, of the proceedings against him, was when he was carried before Judge Hall. He was said to be carried under an affidavit of General Wilkinson before Judge Hall. Captain Gaines requested him to write to him on shore, and he would get what he wanted. He was not permitted to send the letter. Never mentioned this to General Wilkinson till they arrived in Hampton Roads. That he was treated as others while on his way; that is, as well as some, not so well as some, and better than others. Arrived at Richmond on Friday evening; put up at the Bell tavern. Three days elapsed before he saw Colonel Burr. He mentioned the treatment he had received to Colonel Burr, and intended mentioning it to the court on his first appearance, but was told it was unnecessary. That General Wilkinson used no terror against him, and offered to relieve him if he wanted money. Whilst at the mouth of Cumberland river, and when Colonel Burr made his escape, he was one that took Colonel Burr in a wherry and carried him some distance, and left him in the woods; did not hear him address any one. The note written him by General Wilkinson, and sent by Dunbaugh, was left at his house sealed; the object was to obtain some information about Dunbaugh. No letters. Carried Colonel Burr's things to a Parson Bruin's as he was told. They had but few guns, which were traded for as they descended the river. The vessel sailed from New Orleans in half an hour after General Wilkinson came on board. The one hundred and fifty dollars offered him by General Wilkinson, he was induced to believe, was to bribe him to give evidence against Colonel Burr, or it might be considered as a bribe. Said he could obtain from Colonel Tyler a sufficiency to carry him home under his agreement with that gentleman. This conversation took place before the subpoena was served.

Lieutenant Gaines was then sworn. He stated that he received a letter from the attorney general of the United States, enclosing subpoenas for witnesses against Colonel Burr. That he went to New Orleans in consequence, and arrived there on the 7th of May. Called several times at the house where James Knox stayed with Mr. Lindsley and Dr. Mulhollon, and could not find them. He was told by the landlord that those gentlemen walked out whenever he approached; they supposed he had something against them. He told his business and at length saw them. They said that the reason why they endeavored to keep out of his way, was that they had belonged to Burr's party, and did not wish to appear against him. He told them that the commander-in-chief offered them a passage in the United States vessel with him. He desired Knox and Lindsley to say whether they would come or not? Knox said he could not come until he had made some money arrangements, (though Lindsley seemed disposed to come on.) That he then applied to Judge Hall; the judge directed him to obtain an affidavit of the refusal, and that he would take the proper steps. He said that the subpoena might be served by the marshal or sheriff, and proposed that he (Lieutenant Gaines) should be appointed by the marshal, a deputy. He refused, unless he could afterwards be released from any further service in that capacity. Next day the judge told him that the marshal had left a deputation for him, and asked him if he would act; he answered that he would, on the foregoing condition, and that he should not attend to Knox, at New Orleans. Knox appeared always ill-natured, which induced him to ask him if he could do anything for him. He obtained from the United States agent at that place forty dollars, and offered it to Knox, which he, after some hesitation, accepted. In reply to his inquiries, whether Knox wanted assistance, he hesitated, and then said that he wished to go on shore himself, to get some necessaries out of his trunk. He told him that as the vessel was going to sail so soon, he could not, but offered him pen, ink, and paper, and requested him to write to some friend on shore to do what he wanted done, or he would act for him himself. He was then in a very ill humor, and was so when the witness returned on board. James Knox was under no restraint from the time the vessel sailed till they arrived at Hampton Roads. To a question put by Mr. Burr's counsel, by whose authority he acted, Lieutenant Gaines answered, that in every step relative to Knox he acted under the authority of the marshal

at New Orleans, except that he was authorized by the commander-in-chief to offer him a passage in a public vessel. In serving the subpœna he acted under the authority of the attorney general. When at Hampton Roads he inquired of Knox whether he had any disposition to go to Richmond? He said that he wished to come to Richmond, but wished also to leave that vessel. He told him he should leave it, but had not determined how he would be conveyed to Richmond. General Wilkinson told him all would come in a vessel, except those who would come in the stage. His getting off gave him no concern, because he supposed that Knox could be caught again in some part of the country, if he attempted to go away. Whilst the witness was on shore, General Wilkinson procured a vessel in which Knox and others were sent to Richmond. He considered Knox under his authority, not as a military officer, but as a deputy marshal. That he was committed to his charge as such, in virtue of a warrant of commitment issued by Judge Hall. He did not know the reason why the judge made such an order. That General Wilkinson never attempted to exercise any authority over Knox on his passage. That the deputation was not of his own procuring. That he had received an order from the department of war to leave the garrison at which he commanded under the direction of some other person, and to attend to the orders of the attorney general.

Question by Colonel Burr. Did you have previous conversation with General Wilkinson about this deputation? Answer. I had none. I never heard nor had any conception of such a deputation till it was mentioned by Judge Hall. He gave to Sergeant Dunbaugh an order at New Orleans to receive from prison and deliver to the commanding officer on board the United States schooner Revenge, the body of James Knox, and he was accordingly conveyed on board.

Question by Mr. Baker. Was not Dunbaugh a sergeant in the army, and did you not consider him acting as such under you? Answer. I should not have considered any citizen of New Orleans bound to obey my order; I did not consider Sergeant Dunbaugh farther bound than in compliance with his promise. He was called Sergeant Dunbaugh, but I did not consider him under my authority, as a military officer. I took no oath of office; I gave no bond to perform the duties of a deputy marshal; I do not know that I shall get any pay; I have no promise of any. General Wilkinson made his affidavit at his own quarters, before Mr. Cenas. I do not recollect whom General Wilkinson consulted; an attorney had been with him. I delivered to General Wilkinson the subpœnas received from the attorney general of the United States, and among them one for myself, another for Mr. Graham. I always considered myself bound to obey the orders of General Wilkinson. I was bound before

the deputation to obey him, and I continued so. I considered General Wilkinson as having the power of controlling myself, and every person belonging to the army and navy of the United States, on board the Revenge, if he chose to exercise that control; but I do not consider that he did exercise such control. The subpœnas which I delivered to General Wilkinson came into my hands afterwards, but nothing passed between the general and myself on the subject, except that I stated to him the orders I had received, and the power I possessed. My impression was that General Wilkinson must have been privy to the whole, and perhaps recommended that I should transact this business. I communicated to him what Judge Hall had said; that an affidavit must be made of the materiality of Knox as a witness before he could take any steps to compel his attendance. General Wilkinson knew that Knox was put on board the Revenge unwillingly. On our way to Virginia we stopped at the Havana for fresh supplies of water and other necessaries. Some on board were sick; they prevailed on the officers to call. While preparing to go on shore, a shot was fired from the Moro castle, and orders given to come on shore. They went on shore at the request of the sick persons on board made to General Wilkinson and Captain Read. They did not land until after four o'clock in the afternoon, and a little after dark they set sail again. Had good provisions, &c., on board. Heard Captain Read direct the cook to let those people have their provisions regularly. To a question put by Mr. Burr's counsel, he answered that General Wilkinson pointed out the witnesses on whom the subpœnas must be served. He, on several occasions, received advice and instructions from the counsel whom he consulted how to act in executing the business in which he was engaged.

Mr. Randolph.—Upon what authority were the forty dollars received from the military agent? Answer. The money received from the military agent was applied for after several applications from Knox, and General Wilkinson advised me to consult Judge Hall as to whether it were legal to demand money for him, and was told by the judge that it was regular to advance a reasonable sum; and was also told by the military agent that General Wilkinson had advised him to advance that sum. The general advised me to consult the attorney general there, or Mr. Duncan, and the general's own idea corresponded on the subject.

Mr. Graham being sworn, gave the following testimony: A short time after the arrival of Captain Gaines at New Orleans, I was told that he had subpœnas for witnesses, and one for myself; that there was a public vessel that would carry us to Richmond. I then waited on General Wilkinson to know whether I could be accommodated in that vessel? My health was bad at that time.

General Wilkinson agreed that I should, and then said that he understood that there were several witnesses in town, some of whom were unwilling, others unable to come round, and asked me whether I knew any legal means or process by which those who were unwilling could be compelled to come? I told him I did not know, but I supposed the federal judge could inform him. As there was a misunderstanding between the general and the judge, I offered to ask the judge myself whether there were such process, and I did so. At this, or some subsequent time, General Wilkinson told me to ask the judge whether there were any impropriety in advancing money to the witnesses, and to what amount? The judge said, that so far from being improper, the witnesses had a right to demand it. The judge said, in answer to the other question, that if the witness refused to enter into recognizance, or to answer such questions as would satisfy him of the materiality or relevancy of his evidence, from the law, (which he showed me,) he would be authorized to send such witness round under the care of the district marshal. He saw, a few days after, in an outer room at the judge's, Mr. Knox talking with Mr. Keene, a lawyer. Some short time after, when these gentlemen came into the room, the judge asked Knox if he were then willing to answer questions or enter into recognizance? He declined doing either. The judge had that clause of the law before him. He pointed it out to Mr. Keene, and a Mr. Fort, who was in the same situation with Knox, and advised them to do one of the two, or he should be obliged to act rigidly towards them; that he was very unwilling to act against them, but it was his duty, and he must do it. The same gentleman had a curiosity to know what questions they intended to put to him, and then the printed interrogatories were shown to him. The judge asked Mr. Fort to answer these interrogatories, which he refused to do. The judge then sent for the marshal, and committed both of them. In the afternoon Captain Fort gave security in five hundred dollars for his appearance at Richmond, and was released. He understood Captain Fort was going in the ship Amity to New York, in order to come to Richmond; but as Fort told the witness he could not leave New Orleans without injury to his business, it was his own opinion that he would not leave that place. Mr. Keene intimated to the judge that he did not appear as an attorney; but expressed some doubt of the correctness of the proceedings, and of the power of the judge to send Knox round. The ship's stores were good, and the persons treated civilly and not restrained. They slept where he did. They called in at the Havana on account of bad winds, and being chased close in by a British cruiser, Captain Read, who commands the vessel, Mr. Gaines, Mr. Smith, and himself, went on shore to procure fruit, &c. Remained there about three hours. His impression

was, that if the gun had not been fired from the fort, they should not have gone in. That part of the navy of the United States which is at New Orleans, and was formerly under the control of the government, and the officers about New Orleans, when the country was considered to be in a state of danger, was put under the command of General Wilkinson. He saw no guard on his way to New Orleans. I went, said Mr. Graham, partly by land, and partly by water. I went down the river with Captain Fort, who said that he was one of a party whose object was to go against Mexico, of which declaration he made no secret. I do not know by what authority Fort was brought before the judge, but Judge Hall said he felt himself bound to act under the law. I advised Fort not to oppose the judge, who was a very determined man. Fort replied, that Mr. Alexander said that the judge had no right to send him. The judge and Mr. Keene both requested him to request Mr. Gaines to remove Knox out of the prison to the vessel.

Lieutenant Gaines, upon being called up again, said he is an officer of the United States army; never consulted General Wilkinson about accepting the appointment of deputy marshal. He understood Fort was included in the same affidavit with Knox. He sailed from New Orleans in the Revenge; saw General Wilkinson exercise no kind of authority on the voyage.

Mr. Graham said, that General Wilkinson opposed their stopping at the Havana for two reasons: first, that it would occasion delay; and secondly, that his enemies might charge it against him as an improper act. The gun was fired from the Moro castle. I understood that the judge had requested Mr. Gaines to accept the deputation. Gaines did not wish to act. He was urged by myself and others to accept it, and he did accept it, I believe, from motives of patriotism. General Wilkinson exercised no control over the persons on board, and no restraint was used, except what has been mentioned, with respect to the witness, Mr. Knox.

After the testimony was closed, a dispute arose between the counsel which side should begin the argument, both parties claiming the right. After some observations by gentlemen on both sides, it was determined that the correct distinction was, that he who obtained a rule to show cause should close, and, of course, begin the argument.

The court then adjourned till to-morrow, eleven o'clock.

Wednesday, June 24, 1807.

The court met according to adjournment.

Mr. Graham was called by Mr. MacRae, and questioned relative to the state of the public mind at New Orleans, and whether great alarms were not excited by the conspiracy. He answered, that he had not arrived at that place till the month of March, and at that time the public mind was much agitated.

To a question put by Colonel Burr, whether General Wilkinson himself had not contributed to excite those alarms by his violent measures, Mr. Hay objected as improper. Colonel Burr insisted on the propriety of his question.

THE COURT was of opinion, that the witness was only bound to answer such questions as directly applied to the subject before them.

Mr. Graham said, that there was a considerable portion of the people at New Orleans who believed that there was another portion unfriendly to the government. He did not know the measures pursued by the executive at New Orleans. He was then interrogated as to the post offices being robbed of letters. He did not recollect that General Wilkinson particularly informed him how letters of information were received by him; only he observed, concerning a letter partly in cipher, that he had received it from a house at New Orleans; (which Mr. Graham named, but it is not inserted, as he was not distinctly heard;) that the practice of opening letters, if it existed at all, had ceased when he arrived at New Orleans; that General Wilkinson showed him three or four letters. He did not know how those letters were taken from the post office, but it was generally said at New Orleans that the postmaster there had given him those letters.

Colonel Burr asked him whether a considerable number of letters directed to himself, or to others, had not been taken from the post office there? He answered that he knew not; but there was an impression on his mind that letters were improperly taken from the post office; whether by General Wilkinson or not, he knew not. He rather thought not.

Mr. Martin.—Did you not understand that General Wilkinson had placed guards on the river, and on the roads, to stop travellers and passengers from passing?

Mr. Graham.—I did understand that he had placed guards at two points, near New Orleans, for the purpose of arresting suspected characters. I had understood, also, that certain persons had been seized.

Mr. Martin.—Did General Wilkinson never tell you how he got those letters?

Mr. Graham.—He did not.

Captain Murray was then called and sworn. Being interrogated by Colonel Burr, he stated that he was stationed at Ville Grove, two miles above New Orleans. His orders from Governor Claiborne were to stop boats coming down the river and examine them; to examine papers, but break no seal; but that from his orders he would have deemed it his duty to have transmitted letters addressed to suspicious persons to the executive at New Orleans.

Colonel Burr.—Would you have obeyed the governor, since, as an officer, you are strictly bound to obey General Wilkinson?

Captain Murray.—Yes, I should. The orders from Governor Claiborne originated with and always came through General Wilkinson.

The testimony being here closed, a protracted debate ensued, occupying two days, with the exception of some intervening business, which will hereafter be noticed. Mr. Randolph opened in support of the motion, and was replied to by Mr. MacRae. Mr. Botts then addressed the court in support of the motion, and was followed by Mr. Hay on the other side. Messrs. Wickham and Martin rejoined, the latter making the closing argument.

Mr. Randolph, in opening the argument, stated that this was a motion for an attachment against General Wilkinson, to bring him before the court to answer such interrogatories as might be put to him, for a contempt. It was customary, he believed, whenever strong suspicions were excited, that an attachment should go; because it was always within the power of the party charged to purge himself upon his own oath. He commented upon the testimony at length. Great ingenuity was displayed by Mr. R., and the counsel who followed on the same side, in giving the facts testified to by the witnesses a coloring unfavorable to General Wilkinson. The acts of that aristocratic and imperious officer in inviting poor Knox to his house, offering him money, and treating him with so much apparent respect and kindness, were represented as mere arts to draw from him an ex parte deposition which might be held in terrorem over him, when he should come to testify before this court. Failing to get from him such a deposition as he desired, it was alleged that General Wilkinson had then caused him to be arbitrarily and illegally imprisoned with felons and negroes; not to secure his attendance upon this court, but because he had refused to give his deposition. Judge Hall, it was said, must be presumed to have acted under the influence of General Wilkinson, who was exercising a military dictatorship in New Orleans. Knox was taken from the jail to the "prison ship," it was contended, by mere military force. Captain Gaines was never clothed with any civil authority, under his pretended appointment as deputy marshal. The act of congress required that a deputy marshal should qualify in the same way as his principal, by giving bond and taking an oath of office. Captain Gaines had done neither, and hence had no authority to act in the capacity of a deputy marshal. He was in realty acting in his military capacity, under the command of General Wilkinson. His order to Sergeant Dunbaugh, to take the witness from the jail and put him on board the vessel, was "in true military style," and was executed by Dunbaugh as a military command from his superior officer, which he was obliged to obey. The "rifling of private papers by unreasonable and illegal search," by General Wilkinson, was also made the

subject of some very severe strictures, by Mr. Botts.

Messrs. Hay and MacRae defended General Wilkinson against all these charges with zeal and ability. They contended that he had acted with great moderation and caution, considering his situation: "threatened in New Orleans by traitors without and enemies within." That so far from exercising the military power reposed in him in an arbitrary manner, to compel the attendance of witnesses before this court, he had turned the whole matter over to the civil authorities. Even admitting that Judge Hall had acted arbitrarily and illegally, (which was denied,) General Wilkinson could not be held responsible for his acts, as there was no evidence that he had exercised any influence over him. The contrary was presumable, from the fact that Judge Hall and General Wilkinson were not then on good terms, owing to a former difficulty between them. It was conceded that an attachment would lie for preventing or obstructing the attendance of a witness before the court, but denied that there could be any contempt in compelling a witness to come, in obedience to his summons, however illegal the means employed. If General Wilkinson had resorted to illegal means to compel the attendance of the witness, he might have his action against him; but it could not constitute a ground of contempt. It was also contended that the acts complained of were committed, if at all, without the jurisdiction of the court, and therefore could not be inquired into in this proceeding.

MARSHALL, Chief Justice. The motion now under consideration was heard at this time, because it was alleged to be founded on a fact which might affect the justice of the case in which the court is about to be engaged, and because, while the bills were depending before the grand jury, the court might, without impeding the progress of the business, examine into the complaint which has been made. The motion is to attach General Wilkinson for a contempt of this court, by obstructing the fair course of justice, with regard to a prosecution depending before it. In support of this charge has been offered the testimony of Mr. Knox, who states a conversation between General Wilkinson and himself, previous to his being served with a subpœna, the object of which was to extract from him whatever information he might possess, respecting the expedition which was the subject of inquiry in this court; and who states also, that he was afterwards summoned before Judge Hall, who examined him upon interrogatories, and committed him to gaol, whence he was taken by order of the deputy marshal, who was a military as well as civil officer, and put on board the Revenge, in which General Wilkinson sailed, for the purpose of being brought from New Orleans to Richmond.

That unfair practices towards a witness who was to give testimony in this court, or oppression under color of its process, although those practices and that oppression were acted in another district, would be punishable in the mode now suggested, provided the person who had acted therein came within the jurisdiction of the court, is a position which the court is not disposed to controvert; but it is also believed that this mode of punishment ought not to be adopted, unless the deviation from law could be clearly attached to the person against whom the motion was made, and unless the deviation were intentional, or unless the course of judicial proceeding were or might be so affected by it as to make a punishment in this mode obviously conducive to a fair and correct administration of justice. The conversation which took place between General Wilkinson and the witness, on the arrival of the latter in New Orleans, was manifestly held with the intention of drawing from him any information which he might possess relative to the expedition which was then the subject of inquiry. In this intention there was nothing unlawful. Government, and those who represent it, may justifiably and laudably use means to obtain voluntary communications, provided those means be not such as might tempt the person making them to give an improper coloring to his representations, which might afterwards adhere to them when repeated in court. The address stated to have been employed, the condescension and regard with which the witness was treated, are not said by himself to have been accompanied with any indications of a desire to draw from him more than the truth. The offer of money, if with a view to corrupt, could not be too severely reprehended. It is certainly a dangerous species of communication between those who are searching for testimony, and the person from whom it is expected. But in this case the court cannot contemplate the offer as being made with immoral views. The witness had a right to demand from those he was expected to serve a small sum of money, sufficient to subsist him on his return to his home. He was asked whether, on receiving this sum, his objections to giving testimony would be removed. This was certainly a delicate question, but it might be asked without improper motives, and it was pressed no further. This is not shown to be an attempt to contaminate the source of justice, and a consequent contempt of the court in which it is administered.

The imprisonment of Mr. Knox, and the order for conveying him from New Orleans to Richmond, were the acts of Judge Hall. Whether his proceedings were legal or illegal, they are not shown to have been influenced by General Wilkinson, and this court cannot presume such to have been the fact; General Wilkinson, therefore, is not responsible for them. They were founded, it is true, on an affidavit made by him; but

there was no impropriety in making this affidavit, and it remained with the judge to decide what the law would authorize in the case. All the subsequent proceedings were directed by the civil authority. The agents who executed the orders of the judge were indeed military men, who most probably would not have disobeyed the commander-in-chief; but that officer is not responsible, in this way, for having failed to interpose his authority, in order to prevent the execution of the orders of the judge, even if those orders ought not to have been given.

Upon a full view of the subject, the case appears to have been this: General Wilkinson was desirous that the testimony of the witness should be obtained; and aware of the accusations which had before been brought against him for the use he had made of the military power, he was desirous of obtaining the testimony by lawful means, and therefore referred the subject to a judge of the territory, under whose orders all subsequent proceedings were taken. Whether the judge did or did not transcend the limits prescribed by law, those ministerial officers who obeyed his orders cannot be supposed to have acted with a knowledge that he had mistaken his power. Should it be admitted that this would be no defence for them in an action to obtain compensation for the injury, yet it furnishes sufficient evidence that no contempt was intended to this court by General Wilkinson, that he has not been guilty of any intentional abuse of its process, or of any oppression in the manner of executing it.

It is said that Captain Gaines, the gentleman whom the marshal appointed as his deputy for this particular purpose, had not taken the oath of office, and was therefore not legally qualified to act in that character. However correct this observation may be in itself, it does not appear to the court to justify an attachment against General Wilkinson. The person who sees in the possession of another a commission as deputy marshal, and sees that others are acting under that commission, ought not to be subjected to a process of contempt for having made no inquiries respecting the oath which the law requires to be taken.

The attachment will not be awarded, because General Wilkinson cannot be considered as having controlled or influenced the conduct of the civil magistrate, and because in this transaction his intention appears to have been not to violate the laws. In such a case, where an attachment does not seem to be absolutely required by the justice due to the particular individual against whom the prosecution is depending, the court is more inclined to leave the parties to the ordinary course of law, than to employ the extraordinary powers which are given for the purpose of preserving the administration of justice in that purity which ought to be so universally desired.